NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0742n.06
Filed: October 17, 2007

Case No. 06-5877

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL LEE SHORTS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| BENDELL BARTHOLOMEW, individually | ) | DISTRICT OF TENNESSEE |
| and in his official capacity as CARROLL | ) | |
| COUNTY SHERIFF; COUNTY of | ) | |
| CARROLL, TENNESSEE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: GUY, BATCHELDER, and GILMAN, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge. Michael Lee Shorts appeals the order of the

district court granting summary judgment to the County of Carroll, Tennessee (hereinafter "the

County"), and Bendell Bartholomew, the Carroll County Sheriff. Shorts was an inmate in the Carroll

County jail who filed a 42 U.S.C. § 1983 action stating a single claim; that *someone*, *somehow*, had

caused him to remain incarcerated beyond his court ordered release date. In pursuing this claim,

Shorts named two defendants, Bartholomew and the County, and asserted two ways by which the

County might be liable. Both defendants moved for summary judgment, as to all theories, and the

district court granted the motion. Shorts also moved for summary judgment, which the court denied.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Mr. Shorts was arrested on July 10, 2002, and remained in the Carroll County jail until February 13, 2004, some 583 days. During that period, he appeared twice before the Carroll County Circuit Court, pleading guilty to three felonies and two misdemeanors on September 9, 2002, and to five additional felonies on January 13, 2003. The court imposed "split confinement" sentences for each of the ten counts,[1] pursuant to Tenn. Code Ann. § 40-35-306(a), ordered that the sentences run concurrently, and granted credit for time served. As a result, the court essentially sentenced Shorts to one year of incarceration — which began on July 10, 2002, and therefore, would presumably have concluded by July 10, 2003[2] — followed by seven years of probation.

In April 2003, Shorts began to inquire of the Tennessee Department of Corrections ("TDOC") as to when he would be released,[3] and on May 10, 2003, he received a twelve-word letter from one Amber Phillips of the TDOC, stating: "You are serving a split confinement. The jail will calculate your sentence." Shorts then began to inquire of Sue Barnes, the Chief Jailor for the Carroll

---

[1]The court imposed the following sentences: Count 1, aggravated robbery, eight years (split between one year incarceration and seven years probation); Count 2, aggravated burglary, three years (split with one year incarceration); Count 3, burglary of a vehicle, one year (six months incarceration); Count 4, theft, 11 months and 29 days (30 days incarceration); Count 5, theft, 11 months and 29 days (60 days incarceration); Count 6, 7, 8, and 9, forgery, one year each (six months incarceration for each); Count 10, burglary of a vehicle, one year (six months incarceration).

[2]In his brief on appeal, Shorts off-handedly asserts that it is "undisputed" that he was also entitled to "program and behavioral credits," which would further reduce his sentence. We do not agree that this is "undisputed." While it might be correct, *see* Tenn. Code Ann. § 41-21-236(c), it has not been asserted, argued, considered, or decided and we decline to decide it now. Ultimately, we find that the availability of sentence reduction credits is irrelevant to our analysis or the outcome of this appeal, but we recognize that it may be relevant on remand. This assertion is noteworthy, however, because it may explain a discrepancy more pertinent to the present discussion, and which was left entirely unresolved by the district court. Shorts was incarcerated on July 10, 2002, and released on February 13, 2004, which we calculate as being 218 days beyond the prescribed sentence of one year. Shorts insists that he was held for more than 300 days beyond the one year sentence, and in seeking to reconcile these numbers, we find that if Shorts awarded himself credit equal to one-quarter of his one year sentence, *see* § 41-2-111(b), then the additional 91 days, when added to the 218 days, would compute to 309 days beyond the prescribed sentence. As stated previously, this difference between 218 days and 309 days is irrelevant to the present appeal and we will not consider it further. We will conclude, however, by noting that this assumption of sentence reduction credits still does not explain Shorts's original insistence that he was held for 346 days beyond the prescribed one year sentence.

[3]Again, we surmise from this conduct that Shorts believed that he was entitled to inmate sentence reduction credits, which could have provided for his release as early as April 10, 2003. *See* note 2, *supra*.

County Jail, as to when he would be released. Sue Barnes attested, by way of affidavit, that: "On several occasions I contacted Jeff Barnett, who is a State of Tennessee Board of Probation and Parole [O]fficer, inquiring as to when Michael Lee Shorts should be released. I was not given an answer by the State as to when Michael Lee Shorts should be released from the Carroll County Jail." When his one year anniversary passed on July 10, 2003, Shorts remained in jail with no prospect of release, despite his inquiries to Sue Barnes and her ensuing inquiries to Jeff Barnett.

On February 11, 2004, after several months of inactivity — whether due to an inability to calculate a release date or sheer indifference — on the part of Sue Barnes and Jeff Barnett, Shorts's family retained legal counsel to investigate the situation. The next day, Donna Meggs, an employee of Shorts's counsel, contacted Sue Barnes and obtained Shorts's records. Ms. Meggs attested, by way of affidavit, that she also "spoke with Jeff Barnett, Parole Officer for the TDOC[,] and he advised me that as a TDOC representative, he had no involvement with Michael Shorts [sic] split sentence, release date." The next day was a Friday, February 13, 2004, and Ms. Meggs spoke with Terry Dickey, Chief Deputy of the Carroll County Sheriff's Department. She informed Dickey of her conversation with Jeff Barnett, in which Barnett had indicated that local jail officials were responsible for Shorts's release. Ms. Meggs directed Terry Dickey to certain information already in his possession, including: (1) the judgment, which was a split sentence with a predetermined release date; (2) the jail roster, which noted a sentence of one year and a beginning date of July 10, 2002; (3) the letter from Amber Phillips of the TDOC; and (4) the inquiries by Shorts.

In their affidavits, neither Terry Dickey nor Sue Barnes admitted to speaking with Ms. Meggs, but each attested to speaking with the other on that Friday, February 13, 2004. Terry Dickey stated in his affidavit that Sue Barnes contacted him regarding the release date for Shorts; that he

3

contacted Jeff Barnett that same day regarding the release date; and that Jeff Barnett informed him that he had already spoken with Sue Barnes regarding the same. Sue Barnes stated in her affidavit: "On February 13, 2004, I contacted Chief Deputy Terry Dickey of the Carroll County Sheriff's Department regarding Michael Lee Short's [sic] time served. On February 13, 2004, Jeff Barnett contacted me and told me that Michael Lee Shorts had served his time and to release him. Michael Lee Shorts was released from the Carroll County Jail on February 13, 2004."

On February 10, 2005, Shorts filed a 42 U.S.C. § 1983 action in federal court, claiming that the two named defendants, the County and Sheriff Bartholomew, in both their individual and official capacities, had violated Shorts's constitutional rights by causing Shorts to remain incarcerated beyond his release date, in violation of the Fourth and Fourteenth Amendments. Shorts did not name Sue Barnes, Jeff Barnett, Terry Dickey, Amber Phillips, or the TDOC as defendants in the suit. As best we understand Shorts's poorly drafted complaint, we identify at least three separate theories to this claim: (1) Sheriff Bartholomew, in his individual capacity, either caused or failed to prevent the harm (Comp. ¶ 8, 10, 15); (2) the County, in an "individual and/or official" capacity, failed to instruct, supervise, control, or discipline Sheriff Bartholomew, and thereby breached its duty to prevent the harm (Comp. at ¶ 28); and (3) the County, in the person of the Sheriff (i.e., Sheriff Bartholomew, in his official capacity), either caused the harm — through an official policy, custom, practice, or usage — or failed to prevent the harm — by breaching the duty to implement a requisite policy or process (Comp. ¶ 4, 22, 24).[4] Shorts sought compensatory damages, punitive damages, and

[4]Official-capacity suits are, for all intents and purposes, treated as suits against the municipality and we intend as much here. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In construction of this analysis, we are not drawing a new distinction; we address these two theories separately only because Shorts has done so in his pleadings. Specifically, Shorts made two separate, albeit related, arguments: (1) the County — in some vague and undefined manifestation — is liable for failing to instruct, supervise, control, or discipline *the Sheriff*; and (2) the Sheriff is liable in his official capacity for failing to instruct, supervise, control, or discipline his subordinates at the jail. For the reasons stated in the

4

injunctive relief, including the implementation of some type of training program and documentation at the jail for proper release procedures.

The defendants filed a joint answer, denying the allegations and asserting affirmative defenses, and eventually filed a joint motion for summary judgment. In the motion, the defendants argued that because the TDOC has the exclusive responsibility for setting prisoner release dates, pursuant to Tenn. Code Ann. § 40-35-501(o), Shorts's claim must fail as a matter of law. Towards this end, they produced the affidavits of Sue Barnes and Terry Dickey as evidence that the County (i.e., the jail) sought a release date from Jeff Barnett at the TDOC. Sheriff Bartholomew asserted qualified immunity to the claims directed against him in his individual capacity. Shorts, on the other hand, contended that the defendants' legal duty arose from Tenn. Code Ann. § 40-35-307(d), not § 40-35-501(o). He claimed that a genuine issue of fact remained regarding who was responsible for setting the release date from jail, and pointed to the statements by Amber Phillips and Jeff Barnett of TDOC, both of whom said that the jail was responsible for setting the release date. Based on this same reasoning, Shorts moved for summary judgment in his own right, modifying his argument and insisting that Sheriff Bartholomew "was responsible for the procedures for the release of such defendant at the time specified in the order of judgment," and that Sheriff Bartholomew had failed to institute or follow such procedures. In support, Shorts attached the affidavit of Donna Meggs. The defendants replied by reiterating that Tenn. Code Ann. § 40-35-501(o) is the applicable statute, and that § 40-35-307(d), which applies to "periodic confinement," is wholly inapplicable.

Ultimately, the district court granted the defendants' motion for summary judgment and denied Shorts's motion. The court first determined that Tenn. Code Ann. § 40-35-501(o) is the

---

text, we ultimately concluded that Shorts can survive summary judgment on the latter, though not on the former.

5

applicable statute, but that it governs only the calculation of release dates, and therefore, it would not excuse a jailor who stands idly by after being alerted that the inmate's release date may have passed. The court explained that Shorts's failing was "not his inability to overcome the application of the statute [but was instead] his complete failure to produce even a 'scintilla' of evidence supporting his accusation that Sheriff Bartholomew actually 'stood idly by' in the face of known and numerous complaints of the erroneous, prolonged detention of inmates in the County Jail." Based on this lack of evidence, the court concluded that Shorts had failed to substantiate his claim, against either Sheriff Bartholomew or the County, and that it was unnecessary to consider Sheriff Bartholomew's qualified immunity defense. Shorts appealed, asserting that the district court erred by granting the defendants' motion for summary judgment and by denying his motion.

## II.

We review *de novo* the grant or denial of summary judgment. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The party moving for summary judgment bears the initial burden and that burden may be satisfied by affirmative evidence that negates an element of the non-moving party's claim or by "an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met this burden, the non-moving party, in order to avoid summary judgment, must counter by "set[ting] forth the specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322. The substantive law identifies which

6

specific facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-mov[ing party] is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 256, but he must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion." *Anderson*, 477 U.S. at 247-48.

In conducting our review, we need not scour the record or make a case for a party who has failed to do so on his own behalf, but even so, we are still obliged to protect a viable cause of action that a plaintiff has in fact raised. *See Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404-07 (6th Cir. 1992). In the present case, we recognize the district court's difficulty with Shorts's inartful pleadings and incomplete arguments, and we acknowledge the district court's proper reliance on the non-moving party's burden at summary judgment. *See Celotex*, 477 U.S. at 322. Under our *de novo* review, however, we cannot ignore a legitimate claim or deprive Shorts of his right to have genuine issues decided by a jury when those issues are otherwise evident from the record.

**III.**

"To state a claim under § 1983, a plaintiff must allege [1] the violation of [2] a right secured by the Constitution and laws of the United States, and must show [3] that the alleged violation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citing 42 U.S.C. § 1983); *Mezibov v. Allen*, 411 F.3d 712, 716-17 (6th Cir. 2005). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The first element, the defendant's violation of a right, is measured against a background of common law tort principles, including the traditional elements

7

of tort liability as well as the defenses to liability. *Pierson v. Ray*, 386 U.S. 547, 556-57 (1967); *see also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) ("[T]here can be no doubt that claims brought pursuant to § 1983 sound in tort. Just as common-law tort actions provide redress for interference with protected personal or property interests, § 1983 provides relief for invasions of rights protected under federal law . . . and [we] have interpreted the statute in light of the background of tort liability." (internal citations and quotation marks omitted)). Shorts claims that *someone* violated his constitutional by *somehow* causing him to remain incarcerated beyond his release date, and has proposed multiple theories of who and how. In the subsections that follow, we consider each of his separate theories in turn.

The second element, that the right at issue is secured by the Constitution and laws of the United States, is beyond dispute: when a prisoner's sentence has expired, he is entitled to release. *Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1969) (holding that "[t]here is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence"). Perhaps more to the point, an incarcerated inmate has "a liberty interest in being released at the end of his term of imprisonment." *Schultz v. Egan*, 103 F. App'x 437, 440 (2d Cir. 2004); *Davis v. Hall*, 375 F.3d 703, 712-13 (8th Cir. 2004). This liberty interest is most often attributed to the Due Process Clause of the Fourteenth Amendment. *See*, *e.g.*, *Jones v. Jackson*, 203 F.3d 875, 880-81 (5th Cir. 2000); *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1994); *Patton v. Przybylski*, 822 F.2d 697, 701 (7th Cir. 1987); *see also Sample v. Diecks*, 885 F.2d 1099, 1108 (3d Cir. 1989) (citing *Hutto v. Finney*, 437 U.S. 678, 685 (1978)) (Eighth Amendment); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc) (Eighth Amendment); *cf. Foucha v. Lousiana*, 504 U.S. 71, 77 (1992) ("unconstitutional for a State to continue to confine a harmless, mentally ill person"); *McNeil v. Dir., Patuxent Inst.*, 407

8

U.S. 245, 246 (1972) ("when his sentence expired, the State lost the power to hold him, and [] his continued detention violates his rights under the Fourteenth Amendment"). *But see Baker v. McCollan*, 443 U.S. 137, 143-45 (1979) (holding that three days of admittedly improper pre-trial detention did not amount to a deprivation of liberty without due process).[5]

The third element, that the violation was committed by a person acting under color of state law, is similarly beyond dispute. Shorts was incarcerated in the County Jail, which is operated under the authority of the County Sheriff. *See* Tenn. Code Ann. § 8-8-201(a)(3) ("It is the sheriff's duty to . . . [t]ake charge and custody of the jail of the sheriff's county, and of the prisoners therein; receive those lawfully committed, and keep them personally, or by deputies or jailer, until discharged by law[.]"); § 8-8-221(a) ("Except for state prisoners held in the county jail, no person shall be incarcerated in the county jail without the approval of the sheriff, or the sheriff's designee, subject to approval of the court having criminal jurisdiction over the sheriff's jurisdiction, as provided by regulation."). The parties do not dispute that the Sheriff is the final policymaker over the operation of the jail.[6] *See, e.g., Heflin v. Stewart County, Tenn.*, 958 F.2d 709, 713 (6th Cir. 1992).

---

[5]The Fifth Circuit aptly distinguished *Baker v. McCollan* in a case with facts substantially similar to those of the present case, explaining:

> This case presents a substantially different factual context from *Baker* since Douthit has alleged that the defendants imprisoned him for thirty days beyond the sentence imposed upon him without a valid commitment order. Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process. Thus, Douthit asserted a prima facie violation of [§] 1983 by alleging that the defendants, acting under the authority granted to them by Texas law, deliberately confined him without a valid commitment order between November 1, 1973, and November 30, 1973, against his will and over his objections.

*Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980).

[6]We recognize that the Sheriff, in this capacity, may not be the final policy maker for the *County*, but rather, may be functioning as an arm of the State, in which case Eleventh Amendment immunity may bar this suit from federal court. *See generally McMillian v. Monroe County*, 520 U.S. 781 (1997). We also recognize case law from this circuit authorizing courts to "*sua sponte* raise the issue of lack of jurisdiction because of the applicability of the [E]leventh [A]mendment," *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir. 1999), and the ostensibly contradictory Supreme Court case law authorizing the State to waive applicability of the Eleventh Amendment, *College Sav. Bank v. Fla. Prepaid Postsec.*

Because it is clear that this right is secured by the Constitution and the action was taken under color of state law, we turn to Shorts's individual theories of recovery to determine whether, under common law tort principles, he has stated a claim that may survive summary judgment.

**A.**

Shorts alleges that Sheriff Bartholomew, in his *individual* capacity, either directly caused the harm or failed to prevent the harm of incarcerating Shorts beyond the term of his sentence. It is well established that "[d]amages actions against public officials require a careful adherence to the distinction between personal and official-capacity suits." *Gean v. Hattaway*, 330 F.3d 758, 765 (6th Cir. 2003) (edits omitted) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Notably, there is no *respondeat superior* liability under § 1983, such as "where the allegation of liability is based upon a mere failure to act. Rather, the supervisors must have actively engaged in unconstitutional behavior." *Gregory v. Louisville*, 444 F.3d 725, 751 (6th Cir. 2006).

> The law is clear that liability of supervisory personnel must be based on more than merely the right to control employees. Further, a claim of failure to supervise or properly train under section 1983 cannot be based on simple negligence. A failure of a supervisory official to supervise, control, or train the offending individual employees is not actionable absent a showing that the official either encouraged or in some way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved[,] or knowingly acquiesced in the unconstitutional conduct of the offending employees.

*Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989) (internal quotation marks, citations, and edits omitted). A "plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom," *Hafer v. Melo*, 502 U.S. 21, 25 (1991), but correspondingly, a

*Educ. Expense Bd.*, 527 U.S. 666, 675 (1999). Because we find that this is not clearly a jurisdictional matter, *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("subject-matter jurisdiction, because it involves the court's power to hear a case, can never be forfeited or waived"), we decline to raise or consider this issues at this stage.

defendant in a personal-capacity suit, unlike the individual defendant in an official-capacity suit, may invoke the protection of qualified immunity to defeat the action. *Gean*, 330 F.3d at 776.[7]

Here, Shorts failed to produce or identify any evidence that Sheriff Bartholomew directly and personally imprisoned Shorts beyond the term of his sentence, or was even aware of Shorts's presence in the Carroll County Jail at any time. On the contrary, the evidence (i.e., affidavits) provided by both sides leads to the conclusion that Chief Jailor Sue Barnes was personally responsible for Shorts's imprisonment, and that Sheriff Bartholomew was further insulated from the situation by Chief Deputy Terry Dickey. There is no evidence that Sheriff Bartholomew personally acted in any way to cause any effect on Shorts and there is no merit to this accusation. *See Patton*, 822 F.2d at 701 (holding that the wrongfully-jailed plaintiff may not sue the sheriff on a theory of superior's liability, but must sue those actually responsible).

Shorts also alleges, however, that Sheriff Bartholomew personally failed to prevent the harm, due to his deliberate indifference. To prevail on a deliberate indifference theory, "[the] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action [or inaction]." *Id*. (internal quotation marks omitted). "Deliberate indifference has been demonstrated in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation." *Moore v. Tartler*, 986 F.2d 682, 686 (3d

---

[7]We reach the same conclusion the district court did with regard to qualified immunity. Because Shorts is unable to set forth evidence that would support a *prima facie* case against Sheriff Bartholomew in his individual capacity, summary judgment is warranted on that basis and it is unnecessary for us to reach the qualified immunity argument.

Cir. 1993) (citation omitted).

In *Moore v. Tartler*, 986 F.2d at 685, the Third Circuit considered a § 1983 claim by a prisoner who had been improperly held for six months beyond the completion of his sentence due the parole board's misinterpretation of his sentencing order. The court considered whether the prison officials had been put on notice and then simply refused to investigate Moore's complaint of sentence miscalculation. *Id*. at 686. The court found that the "parole board officials did not stand 'idly by' after Moore [had] raised his concerns about the parole board's interpretation of the disputed sentencing order but instead responded to Moore's complaints by beginning an inquiry that culminated in [the judge's] clarifying his sentencing in writing." *Id*. at 687. Therefore, the court explained, "an investigation, however slow and incompetent[,] *was* conducted . . . pursuant to *standard parole board operating procedures*. Significant was the fact that the parole board did not reject Moore's initial complaint outright, or suspend its search once it was begun." *Id*. (emphasis added). Based on these findings, the court concluded that the defendants "were attempting to resolve the confusion over the sentencing order and were taking affirmative steps . . . toward that end. We cannot say that this investigation was so inept or ineffectual that deliberate indifference [on] the part of the parole board officials may be inferred from the evidence here." *Id*. (footnote omitted).

In *Haygood v. Younger*, 769 F.2d at 1354, the Ninth Circuit considered a § 1983 claim by a prisoner who had been improperly held for five years beyond the completion of his sentence due to an incorrect calculation of his release date. The *en banc* court stated that "[d]etention beyond the termination of a sentence could constitute cruel and unusual punishment if it is the result of 'deliberate indifference' to the prisoner's liberty interest," and found that Haygood "presented credible evidence that the defendants, after being put on notice, simply refused to investigate [the]

12

computational error." *Id*. at 1354-55. The court noted that Haygood had written a letter to the warden, alerting him of the error, but that the warden had passed it off to certain records officers, who rejected the claim out of hand and denied further review until Haygood filed a *habeas* petition. *Id*. at 1353. The court concluded that "there was adequate evidence from which the jury could have found liability under the appropriate standard of 'deliberate indifference.'" *Id*. at 1355.

In *Sample v. Diecks*, 885 F.2d at 1102-03, the Third Circuit considered a § 1983 claim by a prisoner who had been improperly held for nine months beyond the completion of his sentence due to a misapprehension by the state prison records officer that there was time remaining on the sentence. The prisoner, Joseph Sample, protested his improper incarceration to his probation officer, various corrections officers, his state representative, and others. *Id*. at 1104-05. Sample made several inquires of Ernest Diecks, the state prison records officer, who at one point contacted the sentencing judge's chambers, but "admitted that he did nothing further regarding Sample's case." *Id*. at 1105. Sample wrote to William Robinson, the Commissioner of the State Bureau of Corrections, but the letter was directed to a subordinate and Robinson never received it or even knew of it. *Id*. Sample also wrote to the Parole Board, and received a response that "confirmed Sample's view that his continued imprisonment was incorrect," which Sample sent to Diecks, whereupon Diecks ordered him released immediately. *Id*. Sample sued Diecks and Robinson, each in their individual capacities. The Third Circuit, citing *Haygood*, 769 F.2d at 1354-55, held that the appropriate standard for determining whether Sample had demonstrated an Eighth Amendment violation was that of "deliberate indifference." The court then set out a three-part test:

> To establish § 1983 liability in this context, a plaintiff must [1] first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. [2] Second, the plaintiff

13

must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. [3] Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

*Id.* at 1110. The court concluded that Diecks was deliberately indifferent, noting that:

Diecks (1) believed Sample's inquiry might well have merit, (2) knew that the matter needed to be clarified, (3) believed Sample had to rely on his (Diecks') efforts alone to rectify the problem, (4) did not follow the relevant procedures mandated by the Pennsylvania Bureau of Correction, (5) took no other remedial action, and (6) did not inform Sample of any other action he (Sample) might take to resolve his problem.

*Id.* at 1111. The court applied its three-part test to Diecks and concluded that he had knowledge of Sample's problem, had failed to act, and that his failure delayed Sample's release by nearly six months. *Id.* at 1112. Because there was no evidence that Robinson had any knowledge of Sample's problem, the court did not analyze Robinson under this test.[8] *See id.* at 1112-13.

In the present case, Sheriff Bartholomew is analogous to Commissioner Robinson, above, while Jeff Barnett, the State of Tennessee Board of Probation and Parole Officer (or perhaps Chief Jailor Sue Barnes) would be analogous to Ernest Diecks. When the Third Circuit's test is applied to Sheriff Bartholomew, Shorts's theory unravels because Shorts has neither produced nor identified any evidence to "demonstrate that [the named] prison official [i.e., Sheriff Bartholomew] had knowledge of the prisoner's [i.e., Shorts's] problem." *See id.* at 1111. We therefore reach the same conclusion as the district court reached and find that Shorts has failed to produce evidence to support his accusation that Sheriff Bartholomew was deliberately indifferent to a known or obvious consequence of his inaction. *See Bryan County*, 520 U.S. at 410; *Moore*, 986 F.2d at 687. Because

---

[8]The court considered two theories under which Robinson could have been liable: (1) that he approved a defective process, and (2) that he failed to enforce any process. *See Sample*, 885 F.2d at 1113-18. Neither theory required any knowledge of Sample's particular situation.

14

Shorts cannot meet his burden of proof on this individual-capacity theory, Bendell Bartholomew's motion for summary judgment — denying liability in his individual capacity — is well taken.

**B.**

As discussed at the outset, Shorts's complaint contains three distinct theories in support of his § 1983 claim: one theory implicating the Sheriff in his individual capacity, and two implicating the County. The first accusation against the County is that it is liable for failing to supervise the Sheriff; the second, which is tendered as an accusation against the Sheriff in his official capacity, but is in fact also an accusation against the County, is that the County is liable for the Sheriff's failure to have a policy or procedure to protect inmates from being held past their discharge dates. Shorts has presented no evidence whatsoever to support the first accusation, but has made a colorable — although meager — showing of the second, and the County has presented nothing to counter.

Based on this finding, we ultimately conclude that, although Shorts cannot survive the County's motion for summary judgment as to his first theory, it remains possible that he could make a sufficient showing to prevail on the second. Hence, based on the record before us, the County cannot obtain summary judgment on Shorts's accusation that the Sheriff is liable in his official capacity. Our reasoning is detailed in the subsections that follow.

**1.**

Shorts alleges that the County is liable under § 1983 because it failed to instruct, supervise, control, or discipline Sheriff Bartholomew, and thereby breached a duty owed to Shorts to prevent his wrongful confinement beyond the prescribed term of incarceration. Shorts accused the County in both an "individual and/or official" capacity; however, Shorts did not name any particular individual or body within the County, other than Sheriff Bartholomew.

15

A municipality does not exist in an "individual" capacity, but only in an "official" capacity, such that "[l]iability under § 1983 attaches only where a policy or custom of the municipality has caused a violation of the plaintiffs' constitutional rights." *See Thompson v. Ashe*, 250 F.3d 399, 409 (6th Cir. 2001) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690-91 (1978)).

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County*, 520 U.S. at 404. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. at 405 (citations omitted); *Knott v. Sullivan*, 418 F.3d 561, 575 (6th Cir. 2005) ("a municipality like Athens County cannot be held liable under § 1983 on a respondeat superior theory" (internal quotation marks omitted)). The policies or customs implicated by a § 1983 plaintiff "may be set by the [municipality]'s lawmakers, or by those whose edicts or acts may fairly be said to represent official policy." *McMillian v. Monroe County*, 520 U.S. 781, 784 (1997). Our task is, therefore, to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor [i.e., municipality] concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). In this case, the obvious official is the Sheriff.

But Shorts alleged that there is "someone" above the Sheriff. One problem with this theory is that Shorts failed to identify *anyone* from the County with "final policymaking authority" *over the*

16

*Sheriff*. A second is that, despite his allegations of an adverse policy or custom, Shorts failed to produce, identify, or even suggest any evidence of any such policy or custom. Shorts consequently failed to produce any evidence of who, if anyone, within the County had any duty to instruct, supervise, control, or discipline the Sheriff. Therefore, Shorts cannot meet his burden of proof on either the culpability or causation requirements, *see Bryan County*, 520 U.S. at 404-05, and, so far as this particular theory is concerned, the County's motion for summary judgment is well taken.

**2.**

Shorts alleges that the County Sheriff, in his *official* capacity, either caused — through an official policy or custom — or failed to prevent — by breaching a duty to implement a requisite policy or process — the harm of incarcerating Shorts beyond the term of his sentence. Although we reach no decision on the merits, we find that the district court erred by granting summary judgment on this theory, as it is properly a question for a jury.

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer*, 502 U.S. at 25. "Suits against [municipal] officials in their official capacity therefore should be treated as suits against the [municipality]," and therefore, "the entity's 'policy or custom' must have played a part in the violation of federal law." *Id*. (quoting *Graham*, 473 U.S. at 166); *accord Gean*, 330 F.3d at 766. "A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002); *see Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000) (stating that a policy is "formally approved by an appropriate decisionmaker"); *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999) (a policy is "a deliberate or conscious choice by a

17

municipality"); *see also Monell*, 436 U.S. at 690 (discussing a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). A "custom," however, need not be formally approved, but must be so permanent, widespread, or well-settled as to have the "force of law." *Bryan County*, 520 U.S. at 410; *Doe v. Claiborne County*, 103 F.3d 495, 507-08 (6th Cir. 1996).

In order to support an official-capacity theory, Shorts needed to connect his wrongful imprisonment with a Sheriff's Department policy or custom. Reading the pleadings generously, we conclude that Shorts has alleged, at most, a policy or custom of deliberate indifference to the timely release of prisoners from the County Jail at the end of their terms. Under the relevant case law, the manifestation of such a policy might have two aspects: (1) the Sheriff failed to supervise his employees adequately when he knew or should have known of the danger that inmates were likely to be detained beyond the end of their sentences, or (2) the Sheriff failed to investigate this incident and punish those responsible, in effect ratifying their actions. *See Leach*, 891 F.2d at 1247.

In *Leach v. Shelby County Sheriff*, 891 F.2d at 1242-43, this court considered a § 1983 official-capacity action against a Tennessee County Sheriff, in which a paraplegic prisoner claimed that he had been mistreated by guards during his stay in the county jail. We noted that, "[i]n Tennessee, the Sheriff has the 'custody and charge' of the County Jail and all prisoners committed thereto," and therefore, the Sheriff had a constitutional, as well as a state law, obligation to provide adequate care. *Id*. at 1247 (citing Tenn. Code Ann. § 41-4-101). We found that "there had been enough similar incidents to put the Sheriff, in his official capacity, on notice that Leach would be subject to constitutional deprivation [at the hands of the guards]." *Id*. (noting 14 prior incidents of abuse reported by paraplegic or physically infirm inmates). Based on these findings, we determined

18

that "the Sheriff was deliberately indifferent to Leach's needs," but emphasized that "the deliberate indifference must amount to a policy of the municipality." *Id*. (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)). We held, based on the record evidence of these 14 prior incidents, that "it is fair to say that the need for more adequate supervision was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great that the County as an entity can be held liable here for the extent of Leach's determined damages." *Id*. at 1248. We also explained that "[f]urther evidence of a policy of deliberate indifference is found in the Sheriff's failure to investigate this incident and punish the responsible parties." *Id*. (citing *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985)). Thus, "[t]he Sheriff's failure to supervise and correct the situation in view of the numerous similar incidents and his failure subsequently to punish the responsible individuals is more than sufficient evidence of a policy or custom to render the County liable for Leach's damages in this official capacity suit." *Id*.

The case now before us presents a stark contrast to *Leach* in terms of the evidence available to support the theory. Shorts produced no evidence of any similar incidents in which an inmate was held in the Carroll County Jail beyond the end of his or her sentence, and accordingly, no evidence that any such incidents were ever reported to the current, or any former, Sheriff. Shorts has produced no basis upon which we might infer that the Sheriff should have known that a prisoner such as Shorts would likely be subjected to any constitutional deprivation. Shorts similarly produced no evidence that Sheriff Bartholomew failed to investigate the incident or punish the offending parties, such as Sue Barnes or Terry Dickey. In fact, Shorts did not even suggest as much. Based on this lack of evidence, we conclude that Shorts has failed to demonstrate a triable question of fact as to the existence of any implicit policy or custom of deliberate indifference that would be sufficient to

19

render the Sheriff's Department liable for Shorts's damages from this official-capacity viewpoint.

Shorts also alleges, however, that the County Sheriff (i.e., Sheriff Bartholomew, acting in his official capacity) failed to implement the requisite policy or process to prevent the harm. Specifically, Shorts argues that the Sheriff's legal duty arises from Tenn. Code Ann. § 40-35-307(d), which requires a county sheriff with custody over an inmate on *periodic confinement* to "adopt procedures for the release of the defendant at the time specified in the order of judgment and for receiving the defendant back into custody at the specified times." Our review of the statute, however, confirms the conclusion reached by the district court. Split confinement and periodic confinement are separate and distinct things. *Compare* Tenn. Code Ann. § 40-35-306 (split confinement), *with* § 40-35-307 (periodic confinement); *cf. Tennessee v. Ruiz*, 204 S.W.3d 772, 776 n.3 (Tenn. 2006) (noting that § 306(c) applies to split confinement, while corresponding provision § 307(f) applies to periodic confinement). Section 307(d) applies to periodic confinement, but Shorts was sentenced to split confinement; therefore, § 307(d) does not apply to Shorts.

Despite the inapplicability of § 307(d), however, we find that the Sheriff does have a duty to care for the prisoners under his watch. *See* Tenn. Code Ann. § 8-8-201(a)(3) ("It is the sheriff's duty to . . . [t]ake charge and custody of the jail of the sheriff's county, and of the prisoners therein; receive those lawfully committed, and keep them personally, or by deputies or jailer, until discharged by law[.]"). Moreover, an incarcerated inmate has "a liberty interest in being released at the end of his term of imprisonment." *Schultz*, 103 F. App'x at 440; *Davis*, 375 F.3d at 713; *Whirl*, 407 F.2d at 791. Finally, "when the state itself creates a statutory right to release from prison, the state also creates a liberty interest and must follow minimum due process appropriate to the circumstances to ensure that liberty is not arbitrarily abrogated." *Haygood*, 769 F.2d at 1355 (footnote omitted)

20

(citing *Vitek v. Jones*, 445 U.S. 480, 488-89 (1980)).

> The responsibility for a failure of communication between the courts and the jailhouse cannot justifiably be placed on the head of a man immured in a lockup when the action of the court has become a matter of public record. Ignorance and alibis by a jailer should not vitiate the rights of a man entitled to his freedom. A jailer, unlike a policeman, acts at his leisure. He is not subject to the stresses and split second decisions of an arresting officer, and his acts in discharging a prisoner are purely ministerial. Moreover, unlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries. *While not a surety for the legal correctness of a prisoner's commitment, he is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.*

*Whirl*, 407 F.2d at 792 (internal citations and footnote omitted; emphasis added).

In *Fairley v. Luman*, 281 F.3d 913, 915 (9th Cir. 2002), the Ninth Circuit considered a § 1983 action against a city police department, in which a suspect was held in jail for 12 days on an arrest warrant issued for his twin brother, despite his repeated explanations and protests. Ultimately, a jury exonerated the individual officers, but found the city liable for its failure to implement procedures for checking to ensure that persons detained on warrants were the individuals named in such warrants. *Id*. at 916. On appeal, the Ninth Circuit explained:

> John [Fairley] had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence. In light of [1] the importance of John's liberty interest, [2] the significant risk of deprivation of that interest through the City's warrant procedures, and [3] the minimum burden to the City of instituting readily available procedures for decreasing the risk of erroneous detention, the procedures afforded by the City to John [Fairley] failed to provide him due process under the Fourteenth Amendment.

*Id*. at 918 (footnotes omitted) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Thus, when the municipality takes it upon itself to arrest and detain its citizens, that municipality must also implement procedures sufficient to satisfy minimum due process to ensure that the citizen's liberty

21

is not arbitrarily abrogated. *Id.*; *Haygood*, 769 F.2d at 1355.

In the present case, the County moved for summary judgment on Shorts's theory that the final decision-maker for the County Sheriff's Department (i.e., the Sheriff in his official capacity) had failed to implement the procedures necessary to protect his right to due process. In moving for summary judgment, however, the County did not produce or identify any evidence to demonstrate the existence of *any procedure at all*, let alone a procedure that would ensure due process. There is no evidence in the record as to what, if anything, Chief Jailor Sue Barnes was actually *required* to do under the present circumstances; what process, if any, existed by which Sue Barnes (or Terry Dickey) would investigate the facts asserted by Shorts or overcome the apparent indifference or incompetence of Jeff Barnett and the TDOC; or what process, if any, existed for Shorts himself to overcome the apparent indifference or incompetence of Sue Barnes. Absent such evidence, we cannot determine at this stage of the proceedings whether the Sheriff's Department policy (or apparent lack of policy) satisfies the Sheriff's duty to protect the rights of inmates such as Shorts. We conclude that the Carroll County Sheriff failed to meet his initial burden in his motion for summary judgment, *see Celotex*, 477 U.S. at 325, and therefore, the district court's grant of summary judgment on this issue was improper and we reverse this portion of the judgment.

## IV.

We **AFFIRM** the district court's denial of summary judgment to Michael Lee Shorts. We also **AFFIRM** the district court's grant of summary judgment to defendant Bendell Bartholomew in his individual capacity. We **REVERSE** the district court's grant of summary judgment to the County with regard to Shorts's allegation against the Carroll County Sheriff in his official capacity, and **REMAND** this case to the district court for further proceedings consistent with this opinion.

22

**RALPH B. GUY, JR., concurring in the judgment of remand.**     Although I join the other two panel members in deciding to remand this case for further proceedings, I write separately because the basis of the remand is reliance on a statutory section not relied upon or cited by the plaintiff in the district court.  Prior to placing reliance on Tenn. Code Ann. § 8-8-201(a)(3), the court rejected every basis for reversal urged by the plaintiff in this appeal.

By joining in the judgment, I do not mean to imply that I agree that Tenn. Code Ann. § 8-8-201 is controlling or even relevant.  The best place for this to be thrashed out, however, is in the district court where the defendant will have an opportunity to respond and the district judge can make an initial evaluation of the import of this statutory section.