RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ALBERT JONES,

                    *Plaintiff-Appellee*,

    *v.*

DAN BOTTOM; ANDREA BENTLEY; ROBERT BELEN,

                *Defendants-Appellants*.

No. 22-5121

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:17-cv-00061—Gregory F. Van Tatenhove, District Judge.

Argued: March 9, 2023

Decided and Filed: October 30, 2023

Before: BATCHELDER, GRIFFIN, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Edward A. Baylous II, COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, for Appellants. Aaron Bentley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellee. **ON BRIEF:** Edward A. Baylous II, COMMONWEALTH OF KENTUCKY, Frankfort, Kentucky, for Appellants. Aaron Bentley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellee.

    READLER, J., delivered the opinion of the court in which BATCHELDER, J., joined. GRIFFIN, J. (pp. 19–31), delivered a separate dissenting opinion.

─────────────────

## OPINION

─────────────────

    CHAD A. READLER, Circuit Judge. An unfortunate series of errors by a Kentucky trial court coupled with inmate Albert Jones's failure to appeal those mistakes resulted in Jones

serving a longer sentence than he was promised by prosecutors. In that respect, the Commonwealth of Kentucky seems to have wronged Jones. The case before us, however, is not the vehicle for remedying that wrong. Defendants—state corrections officials—neither caused nor contributed to Jones's over-incarceration, nor could they unilaterally remedy the matter, which was dictated by two court orders. Because Jones comes well short of showing that defendants deliberately failed to act (or took only ineffectual action), let alone caused Jones's allegedly improper sentence, defendants are entitled to an award of qualified immunity. Accordingly, we reverse the judgment of the district court.

**I.**

Albert Jones committed a string of bank robberies. He was convicted in Indiana and Kentucky as well as in federal court. Today's focus is on Jones's Kentucky offense.

Following his indictment by the Commonwealth, Jones entered into a plea deal. As part of the deal, the prosecutor and Jones agreed to a fixed commencement date for Jones's accrual of time-served credits. Those credits, the deal explained, would begin to run not when Kentucky law enforcement officers actually took Jones into custody, as would ordinarily be the case under Kentucky sentencing law, but instead on an earlier date. The plea agreement, in other words, reflected a negotiated deviation from otherwise-applicable provisions of Kentucky law, one that benefited Jones by affording him an earlier release date.

The rub? When it came time to enter the judgment of conviction, the sentencing court failed to adopt the plea agreement. Rather than using the fixed date in the agreement, the court ordered the Kentucky Department of Corrections, Division of Probation and Parole to calculate Jones's credit for time served in accordance with "this judgment" and "the law." The judgment made no mention of any negotiated agreement between the parties on time-served credits. Nor did the court provide Jones the opportunity to withdraw his plea, a right Kentucky law afforded him should the court not adopt the parties' plea agreement. *Haight v. Commonwealth*, 938 S.W.2d 243, 251 (Ky. 1996). Despite those errors, Jones did not appeal or seek correction of his sentence.

When Jones reported to prison, administrators calculated Jones's sentence in accordance with the "judgment" and "the law"; in other words, Kentucky's sentencing scheme.  Jones asked the administrators to take account of the time-served provision in his plea agreement in determining his time-served credit.  But doing so would have violated the judgment of conviction, which referenced neither a plea agreement nor an agreed-to date for determining time served, facts Jones acknowledges.  Nonetheless, the administrators advised Jones that he had the right under state law to ask the sentencing court for relief or clarification.  He did so.  Yet when he did, the court ratified the administrators' calculations.  And once again, Jones forwent his right to appeal.

Jones would return to the trial court once more.  This time, the court—for the first time—took note of Jones's plea agreement.  In its order, the court instructed that Jones be given credit in accordance with the agreement:  "IT IS HEREBY ORDERED that in accordance with the plea agreement in this matter, Defendant Albert Jones shall be given custody credit time on the above styled matter for all time spent in custody beginning on January 28, 2008."  Jones was released shortly thereafter.

Jones promptly filed this lawsuit.  He alleges that Kentucky prison administrators and the prison warden violated his Eighth and Fourteenth Amendment rights through their alleged deliberate indifference to the prospect of incarcerating him beyond the length of his sentence.  Adding to that, says Jones, the officers falsely imprisoned him in violation of state law.

Without any discovery, defendants moved for summary judgment as to Jones's constitutional claims on the basis of qualified immunity.  The district court denied the motion.  That led to an earlier appeal in this case, in which we held that Jones alleged a violation of a clearly established right—namely, the right to "have one's sentence calculated appropriately and to be released when the sentence has been served"—but that "further discovery" was needed to resolve the "merits of [the] case."  *Jones v. Tilley*, 764 F. App'x 447, 450 (6th Cir. 2019).  Back in district court, defendants again moved for summary judgment on qualified immunity grounds as to Jones's constitutional claims.  The district court, in turn, again denied their motion.  This timely appeal followed.

**II.**

Ordinarily, a district court's denial of summary judgment is not immediately appealable. *See Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985). But the denial of qualified immunity is an exception to this general rule. In that setting, we have jurisdiction to hear an interlocutory appeal of the qualified immunity denial. *Id.* When we do, we accept the district court's factual findings so long as they are not "blatantly contradicted" by the record. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Then, we review the district court's legal conclusions de novo. *Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019).

That brings us to one housekeeping matter. Besides denying qualified immunity, the district court also denied the officers summary judgment on Jones's state law false imprisonment claim. On appeal, the officers renew their argument that they did not falsely imprison Jones. A mine run, state law tort claim like this one, however, is not immediately appealable unless the claim is "inextricably intertwined" with claims that may be appealed in interlocutory fashion. *Browning v. Edmonson County*, 18 F.4th 516, 529–30 (6th Cir. 2021) (quoting *McGrew v. Duncan*, 937 F.3d 664, 670 (6th Cir. 2019)). Jones's false imprisonment claim does not meet that standard, as it is not "coterminous with or subsumed in" the alleged federal constitutional violation. *See id.* at 530 (cleaned up). Because resolving the qualified immunity appeal will not "necessarily determine" the false imprisonment claim, that portion of the appeal must be dismissed for lack of appellate jurisdiction. *Novak v. City of Parma*, 932 F.3d 421, 437 (6th Cir. 2019).

Now to the main event. Qualified immunity shields officials from trial "unless their actions violate clearly established rights." *DiLuzio*, 796 F.3d at 608. To overcome the invocation of qualified immunity, Jones carries the burden of showing that (1) the officials violated his constitutional rights, and (2) that "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). Jones, in other words, must prevail on both of these legal questions.

Previously, we held that "[t]he right [Jones] asserts—his right not to be detained past the expiration of his term of incarceration under the Fourteenth and Eighth Amendments—is one we have recognized as being established 'beyond dispute.'" *Jones*, 764 F. App'x at 449 (citing *Shorts v. Bartholomew*, 255 F. App'x 46, 51–52 (6th Cir. 2007)). That conclusion, however, has shaky underpinnings. For one thing, it strikes at a high level of generality, something case law frowns upon. *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Ashcroft*, 563 U.S. at 742 (reiterating "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'")). For another, it was justified by a single citation to an unpublished decision, *Jones*, 764 F. App'x at 449 (citing *Shorts*, 255 F. App'x at 51–52), something our cases forbid. *Bell v. City of Southfield, Michigan*, 37 F.4th 362, 367–68 (6th Cir. 2022) ("[A] plaintiff cannot point to unpublished decisions to [show the right was clearly established]. . . . For a right to be clearly established, 'existing *precedent* must have placed the statutory or constitutional question beyond debate.'" (emphasis in original) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021))). On these grounds, future parties may bear in mind the questionable nature of this "clearly established" right. For today's purposes, however, the prior panel's ruling is law of the case. *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015). And that, accordingly, tees up the question of whether a constitutional violation occurred.

Jones maintains that defendants were deliberately indifferent to his over-incarceration. To test Jones's theory, we ask whether defendants (1) had knowledge of the risk that an unwarranted punishment was being inflicted on Jones and (2) failed to act or took only ineffectual action under the circumstances; and (3) whether there is a causal connection between defendants' conduct and Jones's allegedly unwarranted punishment. *Jones*, 764 F. App'x at 449 (citing *Shorts*, 255 F. App'x at 55). As explained next, Jones fails to satisfy this legal triumvirate.

1. *Kentucky Sentencing Law*. Kentucky's criminal sentencing framework sets the stage for this appeal. What follows is our understanding of the relevant aspects of that framework.

As Jones's claims trace back to the sentencing court's failure to adopt the terms in Jones's plea agreement, we begin there. In crafting a sentence, Kentucky trial court judges are guided by the sentencing policies adopted by the Kentucky General Assembly in Ky. Rev. Stat.

Ann. § 532.007.  The primary objectives of sentencing, the General Assembly has explained, "shall be to maintain public safety and hold offenders accountable while reducing recidivism and criminal behavior and improving outcomes for those offenders who are sentenced."  *See id.* § 532.007(1).  To effectuate that goal, Kentucky law lays out four classes of felonies with different ranges of authorized imprisonment for each type.  *See id.* § 532.060(2).  A trial judge generally sentences within the prescribed range.  *Id.* § 532.060(1); *see also id.* § 532.070.

Should the trial court be presented with a plea agreement between the prosecution and defense, it has discretion in deciding whether to accept the agreement.  "[T]he trial court has ultimate sentencing authority and . . . is not bound by the plea negotiations of the Commonwealth or the plea bargain itself."  *Prater v. Commonwealth*, 421 S.W.3d 380, 386 (Ky. 2014) (citing *Covington v. Commonwealth*, 295 S.W.3d 814, 817 (Ky. 2009)); *see also Covington*, 295 S.W.3d at 817 (explaining that a sentencing court is not bound by the terms of a plea agreement).  Should the court impose a sentence greater than what was recommended under the agreement, "the court is deemed to have rejected the plea agreement."  *Prater*, 421 S.W.3d at 386.  If so, the court must tell the defendant it is doing so, allowing the defendant an opportunity to withdraw his plea.  *See* Ky. R. Crim. P. 8.10 ("If the court rejects the plea agreement, the court shall, on the record, inform the parties of this fact."); *see also Prater*, 421 S.W.3d at 387 ("[U]pon the determination of the trial court that it will not follow the plea agreement made between the prosecutor and the defendant, the defendant has a right to withdraw the guilty plea without prejudice to the right of either party to go forward from that point." (quoting *Haight*, 938 S.W.2d at 251)); *Matheny v. Commonwealth*, 37 S.W.3d 756, 758 (Ky. 2001) (holding that the trial judge erred by allowing the Commonwealth to withdraw a plea agreement after the court had informed the parties that it had been accepted).

Assuming a guilty plea is entered, the court proceeds to impose a sentence, which it "shall" do "without unreasonable delay."  Ky. R. Crim. P. 11.02.  The sentence is memorialized in a judgment of conviction.  *See generally* Ky. R. Crim. P. 11.04 (outlining the required content for a judgment).  Immediate remedies are available to address any oversights in the judgment.  A clerical error may be corrected by the trial court "at any time."  *See* Ky. R. Crim. P. 10.10 (explaining that "[c]lerical mistakes in judgments, orders or other parts of the record and errors

therein arising from oversight or omission may be corrected by the court at any time"). Or the defendant can bring the issue to the trial court's attention. *See Davis v. Commonwealth*, 620 S.W.3d 16, 32 (Ky. 2021) (explaining that Kentucky Rule of Criminal Procedure 10.10 is the proper remedy when a trial court commits the clerical error of failing to accurately reduce its intended sentence to writing in the judgment of conviction); *Gross v. Commonwealth*, 648 S.W.2d 853, 857 (Ky. 1983) ("[A] defendant is required to avail himself of [Rule] 11.42 while in custody under sentence . . . as to any ground of which he is aware, or should be aware. . . . Final disposition of that motion, or waiver of the opportunity to make it, shall conclude all issues that reasonably could have been presented in that proceeding."). If the trial court refuses to correct a sentence, a defendant may appeal the issue to the Kentucky Court of Appeals. *See* Ky. R. Crim. P. 11.42(7) (discussing ability to appeal a ruling on a motion to vacate, set aside, or correct a sentence). Or a defendant may simply appeal his sentence directly to the Kentucky Court of Appeals. *See Ware v. Commonwealth*, 34 S.W.3d 383, 385 (Ky. Ct. App. 2000) (citing Ky. Const. § 115).

When a defendant arrives to serve his sentence, his time-served credits are calculated by the Division of Probation and Parole, a component of the Department of Corrections. Ky. Rev. Stat. Ann. § 196.075; 501 Ky. Admin. Regs. 6:270 (listing the "Calculation of Custody Time Credit" as within the Division of Probation and Parole's domain); *see also* Ky. Rev. Stat. Ann. § 532.120(3) (detailing that an inmate is entitled to time-served credit). That calculation, it bears emphasizing, must track the inmate's judgment of conviction, not a plea agreement. *Machniak v. Commonwealth*, 351 S.W.3d 648, 652 (Ky. 2011) (holding that notwithstanding any plea agreement or other statement from a sentencing court, "absent an appropriate written correction, [an inmate's] sentence is as stated in the written Judgment"). In Kentucky, time-served credits are calculated from the date an inmate is taken into custody by the Commonwealth, unless a sentence is ordered to run concurrently with another jurisdiction's sentence. Ky. Rev. Stat. Ann. § 532.120(3); *id.* § 532.115 ("If the court does not specify that its sentence is to run concurrent with a specific . . . sentence of another state, the sentence shall not run concurrent with any . . . sentence of another state.").

Kentucky's sentencing structure affords inmates a process for contesting Probation and Parole's time-served credit calculations. Challenges are directed to Offender Information Services, or OIS, a separate component within the Department of Corrections, one that acts in accordance with Section 17.4 of the Kentucky Corrections Policies and Procedures. *Administrative Remedies: Sentencing Calculations*, Ky. Corr. Pol'ys & Procs., https://perma.cc/YZF5-D8EC. In a nutshell, those provisions authorize an inmate to "request a review or explanation of the method of sentence calculation." *Id.* Upon receiving a proper 17.4 request, OIS "shall review the inmate['s] record" and respond with "an explanation of the method of calculation." *Id.* Like the Division of Probation and Parole, OIS administrators, as mentioned, rely on a court's judgment of conviction in processing 17.4 appeals.

If an inmate doubts OIS's time-served calculations, he may return to the sentencing court. *See* Ky. Rev. Stat. Ann. § 532.120(9) (finding an inmate "may challenge a failure of the Department of Corrections to award a sentencing credit . . . by motion made in the sentencing court no later than thirty (30) days after the inmate has exhausted his or her administrative remedies"). The sentencing court's determination, in turn, may be challenged by way of appeal to the Kentucky Court of Appeals. *See, e.g.*, *Woods v. Commonwealth*, 599 S.W.3d 894, 895 (Ky. Ct. App. 2020); *Owens v. Ky. Dep't of Corr.*, No. 2020-CA-1352-MR, 2021 WL 3117108, at *4 (Ky. Ct. App. July 23, 2021); *Hurt v. Commonwealth*, No. 2022-CA-1090-MR, 2023 WL 2542627, at *1 (Ky. Ct. App. Mar. 17, 2023).

2. *Jones's Sentencing.* Despite this largely straightforward sentencing path, Jones's sentence went astray right from the start. Following his indictment on armed robbery charges, Jones reached a deal with the prosecutor. In exchange for pleading guilty, Jones would receive the benefit of a fixed commencement date for accruing time-served credits: "January 28, 2008, when the bench warrant for his arrest was issued." The plea agreement was memorialized in a document signed by both the prosecutor and Jones. When the sentencing court issued its judgment of conviction, however, it directed that "[t]he Department of Corrections, Division of Probation and Parole shall calculate [Jones's] credit time served" in accordance with "this judgment" and "the law." Critically, the judgment made no mention of Jones's plea agreement nor the fixed date for accruing time-served credit reflected in that agreement. The record does

not make clear the reason for this omission. Either way, as Jones acknowledges, the judgment of conviction did not modify Kentucky's standard formula for calculating a defendant's time served. Nor, it appears, did Jones call the error to the court's attention or appeal his sentence to the Kentucky Court of Appeals.

Instead, Jones reported to the Northpoint Training Center in Burgin, Kentucky, to serve his sentence. Heather Foster of the Division of Probation and Parole in Louisville was assigned to calculate Jones's sentence. Based upon the sentencing court's judgment, Foster calculated that Jones was entitled to 1,670 days of time-served credit, dating back to August 14, 2009.

Plea agreement aside, all parties seem to agree that Foster's calculation was likely accurate as a matter of Kentucky sentencing law. But Jones believed his sentence should reflect the terms of the agreement he reached with the prosecutor. So Jones challenged Foster's calculations through the Rule 17.4 administrative process. Only then do defendants enter the picture, largely in cameo roles.

3(a). *Belen and Bentley.* Robert Belen, an OIS administrator in Frankfort, received Jones's administrative challenge. Jones's 17.4 request, excerpts of which are included here, centered on his belief that his time-served credit should be calculated in accordance with his plea agreement rather than the court's judgment:

> According to my plea agreement, I am to receive credits for time spent in custody beginning on January 28, 2008. While the DOC has placed these credits as other sentence credits (1670 credit days), these are still credits that I have spent in custody, whether they are deducted at the beginning or the end of my sentence. . . .

> My plea dictates that my time starts on January 28, 2008. . . . From that date until August 8, 2016 is 3211 day-for-day time spent in prison; whether it be in the federal or state custody. . . . My Maximum expiration date should have been January 28, 2018 and not August 15, 20[1]9. This would have made my [u]ltimate date of July 18, 2016. . . .

As Jones's plea agreement was not included in the court's judgment, however, Belen, like Foster, did not consider the agreement when reviewing Jones's 17.4 request.

Belen reaffirmed Foster's sentencing calculations. Jones, again took issue with those calculations. Andrea Bentley, another OIS administrator, informed Jones that, in accordance with Ky. Rev. Stat. § 532.120(9), Jones had exhausted his administrative remedies and was entitled to return to the sentencing court to contest the Probation and Parole Division's calculation of Jones's sentencing credits.

Jones did so. In his motion to the sentencing court, he asked that the court use the "28[th] day of January, 2008" as the date from which time-served credit should run. The court entered a barebones order requesting "a recalculation of jail time credit" by the Division of Probation and Parole. Once again, the court made no reference to a plea agreement, nor did it deviate from Kentucky's standard formula for calculating time-served credits. Foster responded to the court that she believed her initial calculation to be accurate. But she did not close the door entirely— she told the court that if it had any information which may "refute [her] findings," she would "reexamine" her calculation in light of that information.

At the time, Jones had not completed his prison sentence, even under his own sentencing calculation, meaning the sentencing court could have fully prevented any over-incarceration. Yet in responding to Foster, the court neither modified its original judgment nor ordered Foster to change Jones's time-served credit. Instead, the court sent back Foster's calculations, with the judge's initials appearing on the document. Bentley understood the court's response to mean the court "was satisfied that the [sentencing] calculation had been done correctly."

(b). *No Deliberate Indifference*. By any measure, defendants' honoring of the sentencing court's judgment of conviction is not tantamount to deliberate indifference. Far from it, in fact. A deliberate indifference claim in this context requires knowledge, failure to act, and causation. *Jones*, 764 F. App'x at 449. To be deemed deliberately indifferent to a prisoner's over-incarceration, a prison officer must be "subjectively aware" of the risk. *See Farmer v. Brennan*, 511 U.S. 825, 829, 835 (1994); *Shorts*, 255 F. App'x at 51–52. Even where a factfinder could consider an inmate's over-incarceration sufficiently obvious, in other words, the deliberate indifference standard is not satisfied without evidence of the defendant's actual knowledge of the error. *See Morgan by next friend Morgan v. Wayne Cnty., Michigan*, 33 F.4th 320, 327 (6th Cir. 2022) (noting that "an official who was unaware of a substantial risk may not

be held liable under the Eighth Amendment, 'even if the risk was obvious and a reasonable prison official would have noticed it.'" (quoting *Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011))). While evidence of actual knowledge can sometimes be inferred from circumstantial evidence, *Farmer*, 511 U.S. at 842, such evidence must go beyond even an objective likelihood of over-incarceration and instead reveal a "strong likelihood" of harm to the prisoner. *See, e.g.*, *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020). Likewise, the official must act unreasonably. An officer will not be liable "if [he] responded reasonably" to a known risk, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 845. Among other shortcomings in Jones's theory, there was no failure to act on Bentley's and Belen's part, nor an injury to Jones caused by that failure. Much to the contrary, their actions reflected good-faith efforts to comply with state law, not some sort of animus toward Jones.

(i). As Commonwealth sentencing officials, Belen and Bentley were required to rely on the state court's judgment as well as state law in making sentencing calculations. *Machniak*, 351 S.W.3d at 652 ("[T]he law in Kentucky is clear as to the preeminence of a written judgment. . . ."). Belen explained as much when questioned by Jones's counsel:

> Q:     Does the prisoner's plea agreement matter in any way in an initial sentence calculation?
>
> Belen:     No. We were instructed -- always have been instructed to go by the court orders. Final sentencing documents. From day 1, that never changed final sentencing or revocation.
>
> Q:     Did you ever review a plea agreement in either initially calculating a sentence or reviewing on, you know, a 17.4 appeal whether a sentence calculation was correct?
>
> Belen:     No. Not that I recall. No.

Again, because the judgment of conviction did not take account of the plea agreement's provisions about time-served credit, the administrators likewise could not do so when deriving Jones's sentence. All they could do was follow "this judgment" and "the law," as the court instructed. To be sure, Kentucky law has a safety valve in place to remedy erroneous sentences. But it was one Jones needed to deploy. *Gross*, 648 S.W.2d at 857 ("[A] defendant is required to avail himself of [Rule] 11.42 while in custody under sentence. . . .").

Put another way, Belen and Bentley did not act with deliberate indifference by complying with their state law duties and adhering to the sentencing court's judgment. Especially so, it bears reminding, when the court gave its imprimatur to their actions by tacitly approving Foster's original sentencing calculations. Accepting Jones's telling, the sentencing court twice erred in failing to adopt the terms of the plea agreement. Either way, Belen and Bentley were entitled to rely on the court's determination, a notion we routinely recognize in the warrant and probable cause setting. *See Messerschmidt v. Millender*, 565 U.S. 535, 556 (2012); *cf. Greene v. Crawford County*, 22 F.4th 593, 608 (6th Cir. 2022) (explaining that a "non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to [a] medical professional['s] opinion[]" (internal quotation marks and citation omitted)).

And even if Jones had cited an exceptional (and lawful) avenue Belen and Bentley theoretically could have pursued to take account of Jones's unadopted plea agreement, it surely does not reflect deliberate indifference for failing to do so. *Shorts*, 255 F. App'x at 55. As our sister circuits have recognized, "[i]n making determinations about a prisoner's release, prison officials are permitted to rely upon 'a reasonable interpretation of a state statute.'" *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014) (citation omitted); *see also Campbell v. Florian*, 972 F.3d 385, 397 (4th Cir. 2020) (rejecting a deliberate indifference claim against a prison official for a claim of an incorrectly calculated sentence when the inmate "identifie[d] no obvious additional acts that [the official] should (or even could) have taken"); *Von Schlichten v. Mooney*, 784 F. App'x 58, 63 (3d Cir. 2019) (rejecting a claim for deliberate indifference in time-served sentence calculation when an officer did not look at all the documents he was provided, but only those that were legally relevant). All things considered, there is no evidence that Belen and Bentley were subjectively indifferent to Jones's plight.

Jones reminds us that "he was promised credit" in his plea agreement, raising the question whether "the Commonwealth should be permitted to break its word." A fair point. After all, when viewed as a whole, the Commonwealth's actions disserved Jones. But that disservice is not the product of deliberate indifference on Belen and Bentley's part.

Indeed, the record reflects a sincere effort by the officers to comply with Kentucky law—and no subjective deliberate indifference towards Jones. As Bentley testified, in response to Jones's 17.4 appeal, she consulted all the relevant sentencing documents and court orders in Jones's case:

> I reviewed his sentencing order, saw that it was concurrent. I reviewed the correspondence between controlled intake and the Federal Bureau of Prisons. The documentation we received . . . from them with the amount of time that he spent in federal custody. I looked at his credits to see if he had gotten credit for all of the time. From the sheet, you know, that Bureau prisons said that he served with them. And like I said, I looked at the other letters that he had written and received responses to.

Belen did much the same. Both officers, in other words, engaged with Jones while following the procedures of his 17.4 administrative challenge. Jones, it bears noting, cites no rule or policy that the two failed to follow.

(ii). As for the dissenting opinion, it seems to be deciding a case different from the one before us. It begins by faulting defendants for taking "no action . . . despite having the ability and authority to intervene." Inaction? Defendants reviewed Jones's case and sentence as Kentucky law required. They advised Jones of his rights under Kentucky law, indicating that they could not override the trial court's judgment. True, as the district court noted, neither Belen nor Bentley reached out to the court on their own. But all agree that Foster, whose calculation was reviewed by Belen and Bentley, did so. And Foster advised the court that if there were further sentencing factors for defendants to consider, she would follow the court's instruction.

And what "ability and authority to intervene" did Belen and Bentley enjoy? The two were presented with Jones's unilateral assertion that his criminal judgment was incorrect. That conclusion, however, was anything but obvious, especially when the trial court disagreed with Jones's initial request for a sentencing recalculation. If the dissenting opinion means to say defendants should have amended or added to the court's judgment, what legal authority allowed them to do so? *Machniak*, 351 S.W.3d at 652. In fact, Kentucky law suggests that if the terms of a judgment do not match a plea agreement, sentencing officials can reasonably assume that the terms of any plea agreement had been rejected. *See Prater*, 421 S.W.3d at 386. The dissenting

opinion contends that the judgment accepted the plea agreement. But nothing on the face of the judgment indicates that the agreement was accepted, nor does Jones argue as much.

The lone Kentucky case the dissenting opinion invokes is *Bowling v. White*, 480 S.W.3d 911 (Ky. 2015). It cites *Bowling* for the proposition that defendants lawfully "could have (unilaterally) given Jones 'jail-time credit that was mistakenly left off the judgment of conviction and sentence.'" But *Bowling* has no salience here. To start, the case was decided after Jones's interactions with any defendant, meaning the decision was not established law defendants failed to follow. At the relevant time, controlling Kentucky case law held that "[n]o statutory authority or caselaw granted [the Department of Corrections] the power to set or modify presentencing custody credits." *Bard v. Commonwealth*, 359 S.W.3d 1, 5 (Ky. 2011). And in any event, *Bowling* interpreted a specific statutory provision pertaining to an award of credit for "[t]ime spent in custody prior to the commencement of a sentence." 480 S.W.3d at 916. *Bowling* says nothing about the Department's authority to award credit where an unadopted plea agreement departed from Kentucky's default rule for awarding credit from the time a defendant is taken into custody. In neither its timing nor substance, in other words, does *Bowling* set out a clearly established rule that defendants should have followed.

Alternatively, the dissenting opinion would counsel Kentucky sentencing officials to "write a letter to the court" asking whether the court intended to sentence an offender outside of the default statutory scheme. Setting aside the fact that Foster more or less did solicit the court's input during Jones's request for sentencing relief, the fact remains that his case was not one involving a sentence that fell outside the norm. The judgment, remember, was consistent with Kentucky's formula for calculating time-served credit.

Continuing its march to rewrite Kentucky's sentencing procedures, the dissenting opinion would have defendants review pre-trial matters to assess independently the propriety of the trial court's eventual judgment. Once again, nothing in Kentucky law or the United States Constitution requires as much. Nor, in any event, would that seem to be a wise endeavor. Doing so is akin to examining legislative history to interpret statutory text, a mistaken venture, especially when, as here, all agree that the language of the judgment at issue is unambiguous. *United States v. McAuliffe*, 490 F.3d 526, 535 n.4 (6th Cir. 2007) (noting "the authoritative

statement is the statutory text, not the legislative history or any other extrinsic material" (citation and quotation marks omitted)).  To be sure, the judgment did not include language Jones thought it should.  But there is no doubt about the judgment's clarity.

Perhaps, as the dissenting opinion surmises, there have been instances in Kentucky where an inmate's initial parole date was miscalculated by sentencing officials.  Kentucky's sentencing scheme is complicated, and math errors undoubtedly occur now and again.  But that is not what we have here.  Jones did not take issue with the Parole Office's calculations; indeed, he concedes those calculations were done properly.  Instead, his issue was with the inputs used in his sentencing formula.  And those inputs came straight from the court's judgment.

The dissenting opinion next analogizes Belen's and Bentley's failure to interject themselves in the trial court proceedings to a prison official who fails to contact a medical professional in the face of a medical emergency.  That analogy seems far afield.  For one thing, Jones had a well understood path to relief (here, through the trial court), something an ailing (possibly even incapacitated) inmate needing medical treatment may well not appreciate.  For another, Belen and Bentley did exactly what the medical emergency line of cases would require. *See, e.g.*, *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 465 (6th Cir. 2021).  They were attentive to Jones's issue—before Jones suffered any harm by way of over-incarceration, defendants informed him of his statutory rights, and Foster, whose work was reviewed by Belen and Bentley, had reached out to the Kentucky courts for further review, akin to the officers contacting a medical professional to evaluate an ailing inmate.  And Belen and Bentley took account of the court's subsequent decision ratifying Foster's earlier calculation, just like a prison official adhering to a medical professional's direction regarding a purportedly ill inmate.  In the context of the dissenting opinion's analogy, overriding the course of action directed by the trial court would be akin to prison officials overriding a doctor's diagnosis, neither wise nor reflective of deliberate indifference.

Read at its most extreme, the dissenting opinion directs defendants to question, if not ignore altogether, the state court's judgment, a dangerous concept to say the least.  Having prison officials pick and choose the orders they will honor renders judicial rulings little more than suggestions, a predicament the courts have fought to avoid since the founding. *See Williams-*

*Yulee v. Fla. Bar*, 575 U.S. 433, 445–46 (2015) ("[T]he judiciary 'has no influence over either the sword or the purse; . . . neither force nor will but merely judgment.' The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions." (quoting The Federalist No. 78 (Alexander Hamilton))). Fortunately, our governmental institutions have not followed this treacherous path.

\* \* \* \* \*

We do not blame Jones for his plight. But it is worth remembering the many other state law vehicles available to him for remedying what he believes was a flawed court order, from a Rule 10.10 motion to correct a clerical error, to appealing his sentence, to exhausting his administrative remedies and then challenging the administrative determination in court. Yet, regrettably, Jones failed to utilize either of the first two avenues, a decision his counsel could not justify at oral argument. And when he pursued the third, at defedants' recommendation, the sentencing court denied him relief, even after the sentencing officials invited the court to supply further guidance on the matter.

At day's end, both Belen and Bentley are entitled to qualified immunity.

4. *Warden Bottom.* Now to Warden Don Bottom. His connection to Jones's unfortunate sentencing saga is even more tenuous. According to Jones, at unspecified points in time he had two "very informal" prison yard conversations with Bottom. Bottom told Jones two things, both of which are correct as a matter of Kentucky law. One, that the Warden had no role in sentencing calculations; these calculations were performed by the "offender records" Department in Frankfort. *See generally Central Office Areas of Responsibilities*, Ky. Corr. Pol'ys & Procs., https://perma.cc/8GR2-3TLP. And two, that Jones could pursue his grievance by utilizing the Department of Corrections' "administrative process." To do so, Bottom explained, Jones needed to file a "17"—a Kentucky Corrections Policies and Procedures 17.4 review conducted by OIS. In short, Bottom directed Jones to the correct channels to address his grievance, a fact Jones admits. Otherwise, Bottom had no role in, or nexus to, setting or reviewing Jones's sentence. *See* Ky. Rev. Stat. Ann. § 196.180(1) (defining the warden's role

as "general management"). These actions too are miles away from reaching the deliberate indifference threshold.

Jones responds with a handful of precedents. But those decisions, at best, call into question Bottom's actions only at the highest level of generality. In truth, those cases reflect that we consistently reject stringent applications of liability against prison wardens. Take, for example, our decision in *Shorts*, the principal case relied on by Jones. There, we adopted the Third Circuit's test for deliberate indifference announced in *Sample v. Diecks*. *Shorts*, 255 F. App'x at 55 (quoting *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989)). In *Sample*, the Third Circuit confronted a situation similar to today's case. A prisoner's sentence was miscalculated, resulting in a lawsuit against a prison records officer and a high-ranking supervisory official. *Sample*, 885 F.2d at 1102–03. The court explained that "not every official who is aware of a problem exhibits indifference by failing to resolve it," reasoning that a warden "does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter." *Id.* at 1110; *see also Rhoades v. Tilley*, No. 21-5899, 2022 WL 684576, at *5 (6th Cir. Mar. 8, 2022) (applying *Shorts* and *Sample* to find no deliberate indifference by a prison official who had no role in sentence calculation).

Jones also relies on *Haygood v. Younger*, 769 F.2d 1350, 1354–55 (9th Cir. 1985) (en banc). *Haygood*, however, dealt with prison records officers—all claims of deliberate indifference against the warden were dismissed. *Id.* at 1353. And the decision does not otherwise raise suspicions as to Bottom's conduct here. Although it was not his responsibility, Bottom directed Jones to file an appeal with the relevant authorities. That was more than enough to discharge the warden's duty under *Shorts*, *Sample*, and *Rhoades*.

The dissenting opinion assigns Bottom "at least some responsibility to ensure jail-time credit calculation problems brought to his attention are addressed." Why? Because the Kentucky statute on confinement credit makes administering that sentencing scheme the responsibility of the Department of Corrections, of which Bottom is an employee. By this logic, every one of the Department's thousands of employees bears some responsibility for calculating confinement credit. That is not how Kentucky has organized its corrections department, and

policy judgments as to the best means for doing so are well beyond our purview. For today's purposes, what matters is that Jones's sentencing calculations were performed by the "offender records" Department in Frankfort. Bottom had no role in—or duty to insert himself into—that process.

\* \* \* \* \*

As no defendant acted with deliberate indifference toward Jones, defendants are entitled to summary judgment on those claims. We reverse the judgment of the district court and dismiss the state law false imprisonment appeal for lack of jurisdiction.

———————————

**DISSENT**

———————————

GRIFFIN, Circuit Judge, dissenting.

The Kentucky Department of Corrections (KDOC) imprisoned Plaintiff Albert Jones for seven months after he was entitled to be released. When KDOC informed Jones that his release date would be far later than the date provided for under the terms of his accepted plea agreement, Jones alerted several prison officials of the error. But those officials, despite having the ability and authority to intervene, took no action. This appeal is limited by both its interlocutory nature and our previously established law of the case. Thus, our only task is to determine whether—based on the facts found by the district court—a reasonable jury could find that defendants were deliberately indifferent to Jones's over-incarceration. Because a reasonable jury could so find, I respectfully dissent from the majority's reversal of the denial of summary judgment.[1]

I.

The scope of our review, like our jurisdiction, is limited. This case is before us on interlocutory appeal from the district court's denial of defendants' motion for summary judgment. Ordinarily, such orders are not appealable, but there is an exception for the denial of an affirmative defense of qualified immunity. *Adams v. Blount Cnty.*, 946 F.3d 940, 948 (6th Cir. 2020). That exception, however, comes with limitations. We accept the district court's factual determinations, rely on the plaintiff's record evidence, and view all facts in the light most favorable to the plaintiff, drawing all justifiable inferences in his favor. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We "ignore the defendant's attempts to dispute the facts" found by the district court, so long as those findings are not "blatantly contradicted by the record." *Adams*, 946 F.3d at 948 (citation omitted). The applicable facts are as follows.

———————————

[1]I agree with the majority that we lack jurisdiction to address plaintiff's state-law false-imprisonment claim.

A.

In 2007, Jones was charged with bank robbery in both Indiana and Illinois and was detained in Indiana. On January 28, 2008, Jones was indicted for a Kentucky bank robbery, and Kentucky Circuit Court Judge Brian Edwards issued a warrant for Jones's arrest. Facing these multiple bank-robbery charges but having not yet been convicted of any, Jones remained in pre-trial detention in Indiana. In May 2009, Jones was convicted and sentenced to 63 months' incarceration in federal court in Illinois and soon thereafter was convicted and sentenced to 42 months' incarceration in Indiana. Jones remained in Indiana custody until August 2009, when he was granted parole and transferred to Illinois to serve his federal sentence.

In 2010, Jones appeared for the first time before Judge Edwards in Kentucky. Jones had negotiated a plea deal with prosecutors providing that his Kentucky sentence "shall run concurrent with" his federal sentence and that Jones was "to receive credit for time in custody . . . beginning on January 28, 2008, when the bench warrant for his arrest was issued."

Judge Edwards accepted the plea deal. At the combined change-of-plea and sentencing hearing, Judge Edwards indicated that he was sentencing Jones consistent with the plea agreement. Specifically, Judge Edwards told Jones: "You will be given credit for time that you have spent in custody since January the 28th of 2008. I will order the Department of Corrections to calculate any other time that you may be credited towards the service of this sentence."

The written judgment, entered several days after the hearing, stated that Jones entered a guilty plea "[b]y agreement of the Commonwealth" and that the court "accepted" Jones's guilty plea. It largely tracked the agreement's terms but omitted that he was "to receive credit for time in custody on this indictment beginning on January 28, 2008." Defendants acknowledge this omission was a clerical error by the trial court. The judgment concluded by stating that "[t]he Department of Corrections, Division of Probation and Parole shall calculate credit time served."

As the district court found below, if Jones's jail-time credit were calculated with the starting date of January 28, 2008, he would have been entitled to a release date of around July 28, 2016. But when Jones arrived in KDOC custody in March 2014, after serving his federal

sentence, he learned that KDOC had calculated his release date to be February 14, 2018—19 months later than the date to which he was entitled.

B.

Jones set about notifying officials of his over-incarceration and seeking assistance with obtaining his proper release date.

He first wrote to KDOC staff member Heather Foster (not a defendant here), who had made Jones's initial sentence calculation. Foster responded that she had calculated Jones's release date correctly but recommended that Jones contact KDOC Offender Information Services to address whether he had received the proper credit owed to him. Then Jones spoke with defendant Don Bottom, the prison warden, about his over-incarceration. Bottom told Jones to "deal with it" through the appropriate administrative review channels, and he otherwise took no action.

In October 2014, Jones filed an administrative review form with KDOC Offender Information Services. His form stated, "Per my plea agreement[,] I was to receive credit time served since . . . January 28, 2008. For some reason[,] that didn't happen. My parole eligible date is February 2018, [i]t should be July of 2016." He asked KDOC to "[p]lease correct this huge diff[e]rence in time." Attached to this form were copies of his judgment and plea agreement.

That filing led to several back-and-forth communications between Jones and KDOC staff. The first was from a staff member who indicated that she had "corrected" Jones's parole eligibility date to January 2017 but provided no explanation as to why she had not moved the date to July 2016 as Jones had requested.

Jones appealed that decision and received a response from defendant Robert Belen, a KDOC offender information administrator. Belen's job was to review sentence calculations and ensure they were correct. As Belen knew, it was important to audit and investigate questionable sentence calculations because "sometimes those offenders are right." Indeed, Belen could recall

"numerous incidences" where he had "done the examination, done the review, done the investigation, and that offender went home that day."

Belen reviewed Jones's letter and attachments, and concluded that Jones's "time did not start in 2008 as [Jones] state[d]." He further explained that KDOC's prior response had "erroneously" credited Jones with an extra 385 days. Belen proceeded to deduct the recently given credit and revert Jones's parole eligibility date to February 2018. Belen did not mention any discrepancy between the judgment and plea agreement.

Later, at his deposition, Belen acknowledged that KDOC has procedures to investigate "problem files" where there was a lack of clarity about the intention of a court's sentencing order. For instance, if a court sentenced an offender outside of statutory sentencing guidelines, Belen or his staff would "write a letter to the court" asking whether that was the court's "intention." The letter would request that the court "submit an order correcting the sentence" if the resulting sentence did not meet the court's intent. Copies of that letter would be sent to the prosecutor and to the defense attorney to notify them of the issue. In other instances where credit calculations were disputed, Belen "would contact the [KDOC] Office of Probation and Parole" to investigate the issue. Such contact and discussion would occasionally lead the Office of Probation and Parole to "contact the court" to clarify a jail-time-credit question.

Here, Belen could not recall contacting the Office of Probation and Parole and there is no evidence that he contacted the court to discuss Jones's situation. The district court found that he neither audited Foster's calculation of jail-time credit nor offered Jones the opportunity for an administrative hearing to learn more about the problem.

Jones replied to Belen by letter, explaining his problem in even more detail and reiterating that he was entitled to credit from January 28, 2008. He again attached his signed plea agreement. Belen did not respond.

Jones next received a letter from defendant Andrea Bentley, an administrator who reported to Belen. Her job was to supervise and audit sentence calculations. It was her responsibility to ensure that prisoners received all credit they were entitled to for pre-sentence jail time. Before drafting her letter to Jones, she reviewed the correspondence and attachments

that were in Jones's file. She, like Belen, did not consult with anyone else before responding to Jones.

In her letter, Bentley informed Jones that he was "not entitled to any other time." Bentley's letter did not reference the discrepancy between the plea agreement and the judgment or discuss any findings regarding the correct date to begin calculating his jail-time credit. Bentley did, however, inform Jones that he could "challenge this decision by motion made in the sentencing court."

Jones then filed a motion before Judge Edwards requesting his jail-time credit be properly awarded. Judge Edwards ordered Foster to recalculate Jones's jail-time credit. Foster recalculated and, once more, concluded that Jones should be awarded no jail-time credit. After Foster replied to Judge Edwards, however, no order was entered "requiring the Department of Corrections to give additional sentence credit."

Having diligently pursued relief through the administrative channels, Jones again met with Warden Bottom for help with preventing his over-incarceration. Bottom "just shrugged [Jones] off" and told Jones there was nothing he could do.

## C.

In August 2016, Jones—now past the July 2016 date when he should have been released—filed a second motion with Judge Edwards. This time, Judge Edwards granted Jones's motion on February 21, 2017. Judge Edwards ordered that KDOC give Jones "custody credit time . . . for all the time spent in custody beginning January 28, 2008." Although Jones received Judge Edwards's order on February 23 and immediately informed prison officials, he was not released for another four days until February 27, 2017—215 days beyond his proper release date.

## D.

Jones filed this lawsuit, alleging that Belen, Bentley, and Bottom (1) violated his Eighth and Fourteenth Amendment rights when they incarcerated him beyond his release date, and (2) falsely imprisoned him in violation of state law. Defendants promptly moved for summary judgment on qualified-immunity grounds, which the district court denied as premature.

Defendants appealed. We affirmed, holding that Jones had pleaded a violation of a clearly established constitutional right. *Jones v. Tilley*, 764 F. App'x 447, 450 (6th Cir. 2019). After discovery, defendants again moved for summary judgment on qualified-immunity grounds. The district court again denied the motion in relevant part, and defendants timely appealed.

II.

A government official is entitled to qualified immunity unless the evidence would permit a reasonable juror to find that "(1) the defendant violated a constitutional right; and (2) the right was clearly established." *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023) (citation omitted). We can decide these prongs in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and we have already decided the second prong in Jones's favor, *Jones*, 764 F. App'x at 449 (6th Cir. 2019). That prior decision is the law of the case, and we are bound by it. *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015).

The sole question before us in this appeal is whether a reasonable jury could find—based on the district court's factual determinations and Jones's record evidence, viewed in the light most favorable to Jones—that defendants violated his Eighth and Fourteenth Amendment rights by being deliberately indifferent to his over-incarceration. To survive summary judgment for each defendant, Jones must demonstrate:

> (1) . . . that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted;
>
> (2) . . . that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight; and
>
> (3) . . . a causal connection between the official's response to the problem and the infliction of the unjustified detention.

*Jones*, 764 F. App'x at 449 (quoting *Shorts v. Bartholomew*, 255 F. App'x 46, 55 (6th Cir. 2007)) (line breaks added and brackets omitted).

After applying the three above elements, I would hold that the facts are sufficient for a reasonable jury to find that defendants were deliberately indifferent to Jones's over-incarceration.

A.

*Knowledge.* "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact[,] . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Jones showed triable fact issues regarding each defendants' knowledge of the risk of his over-incarceration.

Both Belen and Bentley had Jones's written explanation of his plight. They had the judgment and plea agreement, and they acknowledged that they reviewed those documents before responding to Jones. The authenticity of the plea agreement is undisputed. It clearly provided the date on which Jones's credit calculation was to begin. The judgment stated that Judge Edwards "accepted the Defendant's guilty plea," which was made "[b]y agreement of the Commonwealth." Upon acceptance, that plea agreement became a binding and enforceable contract between Jones and the Commonwealth of Kentucky. *Matheny v. Commonwealth*, 37 S.W.3d 756, 758 (Ky. 2001). That contract imposed on the Commonwealth—and its employees—an "obligation to adhere to the terms of a completed plea agreement." *Id.*; *see also Brock v. Sowders*, 610 S.W.2d 591, 592 (Ky. 1980) ("[T]he government should not be allowed to welsh on its bargain.") (citation omitted). Those terms included jail-time credit that would be calculated beginning on January 28, 2008.

The judgment imposed a sentence consistent with the plea agreement's terms—10 years.[2] It tracked the plea agreement's language but omitted the sentence regarding the calculation start date, which defendants concede was a clerical error. And the judgment put the onus on KDOC to correctly "calculate credit time served." Both Belen and Bentley had knowledge of Jones's

---

[2]The majority, citing *Prater v. Commonwealth*, 421 S.W.3d 380 (Ky. 2014), asserts that where a judgment's terms do not perfectly match those of an accepted plea agreement, sentencing officials can reasonably assume the plea-agreement terms were rejected. That assertion mischaracterizes *Prater*, which contains no such holding. *Prater* states that a trial court "is deemed to have rejected" a plea agreement where "the trial court imposes a sentence greater than that recommended by the Commonwealth under a plea agreement." *Id.* at 386. There, the court opined that if a plea agreement required the Commonwealth to recommend a sentence of 20 years but the trial court sentenced the defendant to 38 years, then "that sentence would serve as a rejection of the agreement." *Id.* at 388. Here, by contrast, the judgment imposed a sentence of 10 years—the same as what the plea agreement recommended. The sole discrepancy was the start date for the custodial credit calculation for that 10-year sentence—where the plea agreement provided for a specific date, the judgment was silent.

imminent over-incarceration, or at least the "strong likelihood" of his over-incarceration was sufficiently obvious based on the information they had before them. *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020) (citation omitted); *see also Farmer*, 511 U.S. at 842.

Bottom, too, was on notice about Jones's imminent over-incarceration because Jones explained the problem to him twice. The second time, Jones told Bottom that he had followed Bottom's initial advice and still had not received the proper credit after pursuing relief through administrative channels.

On these facts, a reasonable jury could find that all three defendants had knowledge of the risk of Jones's over-incarceration.

B.

*Ineffectual Action*. Likewise, the district court's factual findings give rise to triable fact questions regarding defendants' actions (or inactions). In a deliberate-indifference claim, our analysis of a defendant's action in response to notice of risk of harm turns on whether that action was "reasonable" under the circumstances. *See Farmer*, 511 U.S. at 844; *see also Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016) (asking whether prison officials disregarded a risk of serious harm "by failing to take reasonable measures to protect" the prisoner).

Despite Belen's and Bentley's responsibilities to audit and investigate sentence calculations, the district court found that they did nothing to investigate Jones's claim, verify Foster's initial sentence calculation, or confirm whether Jones was entitled to additional credit. In the district court's words, their actions were akin to only a "cursory check" of possible computation error, not investigation into whether Jones was entitled to additional credit. Further, Belen inexplicably reversed Jones's first jail-time-credit recalculation, returning Jones's parole-eligibility date to February 2018. In other words, Belen took no effectual action to prevent harm to Jones; rather, he summarily took action that *added* to that harm.

Belen and Bentley could have, and should have, done more to prevent Jones's harm. As KDOC employees, they were required—both by the judgment and by statute—to ensure that

Jones's jail-time credits were calculated correctly. *See* Ky. Rev. Stat. § 532.120(3). Belen explained that, in other instances, he or his staff took reasonable steps to investigate sentence-calculation disparities. His office had a procedure for "problem files" where he would write to the court (and notify the prosecutor and defense attorney) where the intention of a sentencing order was unclear. But neither he nor Bentley made such contact here.

Belen and Bentley even had the authority to "award an inmate jail-time credit that was mistakenly left off the judgment of conviction and sentence." *Bowling v. White*, 480 S.W.3d 911, 918 (Ky. 2015).[3] Under the relevant version of Ky. Rev. Stat. § 532.120(3), KDOC "has the power (indeed, the responsibility) to credit '[t]ime spent in custody' toward an inmate's sentence." *Bowling*, 480 S.W.3d at 917. Included in this responsibility "is a limited authority to correct mistakes" in a court judgment that "fail[ed] to award jail-time credit or . . . award[ed] too little jail-time credit." *Id.* Here, by defendants' own admission, the judgment contained a mistake as to when Jones's custodial credit calculation was to begin. Under the terms of the accepted plea agreement, the judgment "should have" indicated that the calculation was to begin on January 28, 2008—a date when Jones was already in jail and awaiting his "initial conviction." *Id.* at 913. But defendants, instead of awarding Jones the credit to which he was entitled (or at least investigating the issue), did nothing.[4]

The majority asserts that Belen and Bentley took all appropriate action because they "reviewed" the documents in Jones's administrative-appeal file. But a reasonable jury could find

---

[3]The majority brushes *Bowling* aside because it was decided after much of Jones's interactions with defendants. Yet *Bowling* was interpreting Ky. Rev. Stat. § 532.120(3), which "was amended in 2011 to assign to Corrections the task of giving custody credit to inmates." *Bowling*, 480 S.W.3d at 914–15. By contrast, *Bard v. Commonwealth*, the case the majority claims is controlling, analyzed "the prior version of KRS 532.120(3)." 359 S.W.3d 1, 4 n.3 (Ky. 2011). Following the 2011 statutory amendment, *Bard*'s holding now controls only "where a trial court mistakenly awarded too much credit when acting under the prior version of KRS 532.120(3)." *Bowling*, 480 S.W.3d at 918 (discussing *Bard*). *Bard* is irrelevant here where Jones alerted KDOC officials—in 2014, well after the statute was amended—that the judgment mistakenly omitted language giving him jail-time credit to which he was entitled. *See id.* When Jones alerted KDOC officials to his problem, they had the statutory authority to award credit for time spent in custody that was "mistakenly left off the judgment." *Id.* And that statutory authority applies to convictions, like Jones's, that were effective before the statute was amended. *Id.* at 917.

[4]The majority's assertion that *Bowling* does not "set out a clearly established rule that defendants should have followed" is inapposite. We already held that the constitutional rights Jones asserts were clearly established. *Jones*, 764 F. App'x at 450. *Bowling* shows that defendants had statutory authority under Ky. Rev. Stat. § 532.120(3) to take effectual action here.

that review alone was unreasonable.  Indeed, viewed in the light most favorable to Jones, the fact that Belen and Bentley reviewed Jones's file makes their lack of follow-up investigation all the more egregious.  If they reviewed Jones's file, they would have seen that the judgment was missing a key date from the plea agreement in an apparent clerical error.  A reasonable jury could find that taking no action on such a file—such as contacting the court, contacting the Office of Probation and Parole, or holding an administrative hearing—was an unreasonable response to the risk of a prisoner serving an extra 19 months in prison, especially when it was their duty to ensure the proper sentence calculation.

In evaluating the reasonableness of Belen's and Bentley's inaction, the majority not only fails to defer to the district court's factual findings but goes a step further and makes its own. For instance, the majority suggests that Belen and Bentley reviewed and "took account of the court's subsequent decision ratifying Foster's earlier calculation."  Belen and Bentley did no such thing.  Foster communicated with the court only *after* Belen and Bentley sent their responses to Jones.  The district court found no evidence to suggest that Belen or Bentley ever contacted Foster, let alone the court, or did anything to verify Foster's calculations.  Under those binding factual findings, *DiLuzio*, 796 F.3d at 611, Foster's subsequent communication with the court is irrelevant to whether Belen's and Bentley's inaction was reasonable.

My colleagues further impose their own fact-bound conclusion that Belen and Bentley "compl[ied] with [their] state law duties and adher[ed] to the sentencing court's judgment."  But nowhere did the district court find that defendants were applying state law, let alone that they believed they were bringing Jones's sentence in line with it.  There is no basis in the record— certainly not when viewing the facts in the light most favorable to Jones—to assert that Belen and Bentley were "honoring" the sentencing court's judgment by ignoring the plea agreement or that "their actions reflected good-faith efforts to comply with state law."  Belen's supposed "instruct[ion]" to focus only on the four corners of the judgment, to the exclusion of a plea agreement that judgment accepted, hardly resolves the question about whether doing so was reasonable under the circumstances here.

And the majority attacks a straw man by suggesting that, for Belen and Bentley to have taken any action here, they would have needed to "ignore" or "override" the judgment.

What part of the judgment would they have needed to ignore or override to investigate the appropriate start date for Jones's sentence? The majority points only to the words "this judgment" and "the law." But what about the part of the judgment that accepted the plea agreement? What about the law that accepted plea agreements are binding on state officials? *See, e.g.*, *Matheny*, 37 S.W.3d at 758. The judgment omitted any date when the sentence calculation was to start, but the plea agreement—which the judgment referenced and accepted— contained such a date. Corrections officials seeking to clarify whether a court order mistakenly omitted jail-time credit to which a defendant is entitled is not some threat to the very foundations of our judicial system, as the majority would characterize it. Rather, it is reasonable action that aligns with KDOC's procedures to contact the court where its intentions are unclear, statutory responsibilities to correct mistakes in judgments that award too-little jail-time credit, and constitutional duties to prevent obvious risks of over-incarceration to inmates. In sum, the majority's lengthy discussion of Kentucky sentencing law identifies no law that prevented defendants from investigating or addressing Jones's problem and no law that made it reasonable for them to do nothing. Belen and Bentley, despite their ability to do so, took no effectual action here.

Bottom, too, took no effectual action after receiving notice of Jones's problem. As warden, Bottom is "responsible for the management of his or her institution," and "the inmates thereof." Ky. Rev. Stat. § 196.180(1)–(2). And, as a KDOC employee, he bears at least some responsibility to ensure jail-time credit calculation problems brought to his attention are addressed. *See* Ky. Rev. Stat. § 532.120(3) ("Time spent in custody prior to the commencement of a sentence . . . shall be credited by the *Department of Corrections . . . .*") (emphasis added).

After Jones's first meeting with Bottom, Bottom arguably took some action by advising Jones to pursue relief through administrative channels. But at the second meeting, when Jones informed Bottom that he was still at risk of over-incarceration after seeking relief through administrative channels, Bottom "refused to take any action." It may be true that a warden "does not exhibit deliberate indifference by failing to address a sentence calculation problem brought to his attention when there are procedures in place calling for others to pursue the matter." *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989). But here, Bottom learned that those procedures

did not correct the problem for Jones and that an inmate at his institution may be at risk of serving 19 months longer than his appropriate sentence. In response, he "shrugged [Jones] off." A reasonable jury could find that Bottom was deliberately indifferent to Jones's over-incarceration in violation of the Eighth and Fourteenth Amendments.

C.

*Causation*. The majority holds that Jones's case fails on causation, stating that defendants had no authority to "unilaterally remedy the matter." But whether defendants could "unilaterally remedy the matter" is not the test. The correct legal question is whether there is "a causal connection" between defendants' unreasonable "response[s] to the problem and the infliction of the unjustified detention." *Jones*, 764 F. App'x at 449 (quoting *Shorts*, 255 F. App'x at 55). In other words: had defendants responded reasonably, is it more likely than not that the harm would have been prevented?

Consider, for example, deliberate-indifference cases involving medical needs. There, prison officials, who presumably lack medical training to address medical emergencies themselves, cannot "unilaterally remedy the matter." Rather, whether they showed deliberate indifference turns on whether they took reasonable steps to prevent the harm, such as by contacting medical professionals or referring the matter to others. *See, e.g.*, *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317–18 (6th Cir. 2023); *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 896–900 (6th Cir. 2004).[5]

Here, a reasonable jury could find that all three defendants could have taken reasonable action that likely would have prevented Jones's over-incarceration.

Belen and Bentley, the KDOC employees responsible for auditing sentence calculations and ensuring their accuracy, could have (unilaterally) given Jones "jail-time credit that was mistakenly left off the judgment of conviction and sentence." *Bowling*, 480 S.W.3d at 918. Or, if they thought the judgment needed correction before they could take such action, they could

---

[5]The majority again deploys its own, unsupported, factual finding that defendants "took account of the court's subsequent decision ratifying Foster's earlier calculation" to argue this action was "akin to . . . contacting a medical professional to evaluate an ailing inmate." Again, the majority fails to defer to the district court's factual findings, which were that defendants neither contacted Foster nor verified her calculations.

have followed their "problem file" procedures to clarify the court's intention in the sentencing order. Such a letter from a KDOC employee drawing Judge Edwards's attention to the start-date problem likely would have resulted in Judge Edwards correcting the clerical error, as demonstrated by his eventual February 2017 order. Instead, Belen and Bentley stood "by idly after an inmate ha[d] raised the prospect that he [was] being unlawfully incarcerated and ha[d] provided documentary evidence in support of his claim." *Alexander v. Perrill*, 916 F.2d 1392, 1398 (9th Cir. 1990).

Bottom, as warden, undoubtedly had the ability to refer this problem to other KDOC employees who could investigate the matter and ensure that Jones was not being imprisoned beyond his appropriate sentence. A reasonable jury could find that, had he brought others' attention to this matter, Jones's over-incarceration could have been prevented.

Instead of asking how defendants' actions could have prevented the harm to Jones, the majority focuses on Jones's actions, noting that he had other avenues to challenge his jail-time credit calculation under Kentucky law. But a deliberate-indifference claim does not require an exhaustion of remedies. We are concerned only with *defendants'* failures to take reasonable steps to prevent his harm. *See, e.g.*, *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993) ("Deliberate indifference has been demonstrated in those cases where prison officials were put on notice and then simply *refused to investigate* a prisoner's claim of sentence miscalculation") (emphasis added). It is of no moment that Jones could have done more to advance his cause.

## III.

Reasonable minds could disagree about the reasonableness of defendants' inaction. Given the evidence Jones has presented and the facts found by the district court, I would affirm the district court's denial of qualified immunity. I therefore respectfully dissent.